U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

AUG 0 8 2008

ROBERT H. SHE~~~~~, CLERK
BY _____

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

CHARLES M. SMITH, ET AL.

versus

RIVERWALK ENTERTAINMENT
LLC, ET AL.

CIVIL ACTION NO. 05-1416
JUDGE TOM STAGG

## MEMORANDUM RULING

Before the court are two motions for summary judgment, one filed by defendant the City of Bossier City ("the City"), and the other filed by defendants Riverwalk Entertainment, LLC ("Riverwalk Entertainment"); Louisiana Riverwalk, LLC ("Louisiana Riverwalk"); Riverwalk Manager, LLC ("Riverwalk Manager"); BW Land Holdings, LLC ("BW"); O&S Holdings, LLC ("O&S"); and John Good ("Good") (collectively referred herein as the "Riverwalk Group"). See Record Documents 103 and 107. For the reasons stated below, the City's motion for summary judgment (Record Document 103) is **GRANTED IN PART** and **DENIED**

**IN PART**, and the Riverwalk Group's motion for summary judgment (Record

Document 107) is **GRANTED IN PART** and **DENIED IN PART**.[1]

---

[1]It should be noted at the outset that the Riverwalk Group has objected to the plaintiffs' proffered summary judgment evidence. See Record Document 131. In rendering its decision, the court did not consider any evidence that was not admissible. Having said that, the court notes with considerable frustration that the plaintiffs did not provide any specific page and line numbers of their multiple offerings in opposition to the defendants' motions for summary judgment to what has now become the huge record in this case. Instead, they merely direct the court to lengthy exhibits–affidavits and depositions–they submitted, which the court was forced to wade through to reach what it hopes was the most pertinent material. This is not a gainful effort to reach a fact finder. Moreover, plaintiffs' application of stated law to the facts of this case was in the form of numerous questions asked about the case with counsel claiming that the existence of such questions indicates the necessity of a trial in this case. See Record Document 136. This, too, is not helpful to the court.

District courts have a "limited and neutral role in the adversarial process" and should be not become advocates who comb through the record and make a party's case. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998). According to the Fifth Circuit, "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." Ragas v. Tenn. Gas & Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) (emphasis added). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." Id. In fact, section (c) of Rule 56 specifically requires the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Though it should be obvious and has been stated by courts before, "judges are not like pigs, hunting for truffles buried in briefs." De la O v. Housing Auth. of City of El Paso, Tex., 417 F.3d 495, 501 (5th Cir. 2005) (citations and quotations omitted). The plaintiffs obviously know that the evidence exists because they noted particular exhibits. The court admonishes the plaintiffs for

# I. BACKGROUND

This case is a convoluted dispute over property that has been developed as part of the Louisiana Boardwalk retail and entertainment center located on the banks of the Red River in Bossier City, Louisiana ("Boardwalk"), a project originally named the Louisiana Riverwalk. Two separate parcels of land are at issue in this suit: (1) Lots 1, 2, 3 and 5, McCormick Annex of Block 17 ("Lots 1, 2, 3, and 5") and (2) Lots 8, 9, and 10, located west of Block 6, West McCormick Annex ("Three Lots").

Pursuant to a cash sale deed signed on July 9, 1974, plaintiff Charles Smith ("Smith") acquired Lots 1, 2, and 3 of Block 17, McCormick Annex, and Block 6, McCormick Annex West ("Block Tracts"), including all rights of accretion, from Cortez and Ruby Wart. See Record Document 107, Ex. E. This deed was recorded on July 12, 1974. See id. On November 31, 2001, Smith and Riverwalk Entertainment, through John Good, entered into an agreement ("Purchase Agreement") in which Smith agreed to sell Riverwalk Entertainment Lots 1, 2, 3, and

---

this filing and notes in no uncertain terms that no other document is to be filed with this court without specific citations and clear application of such specifically cited evidence to the allegations being made.

5 of Block 17 and Block 6, specifically excluding any accretion or alluvion[2] of the property, for $450,000. See Record Document 107, Ex. A-4. In return, Riverwalk Entertainment granted Smith the right to repurchase 25,000 square feet of the property on which Smith was to operate a live performance theater and recording studio. See id. This Purchase Agreement was not recorded. (The court notes, in passing, that this agreement was drafted by Smith's attorney.) Through a cash sale deed dated January 11, 2002, Smith conveyed to Riverwalk Entertainment Lots 1, 2, 3, and 5 of Block 17 and all of Block 6. The deed included highly disputed language, "together with all of the alluvion, dereliction and batture lying between the above described tracts and the Red River" of the two properties. See Record Document 107, Ex. D. This deed was recorded on January 16, 2002.

Meanwhile, on June 1, 2002, the City and Riverwalk Entertainment entered into a Master Development Agreement ("MDA"), in which Riverwalk Entertainment agreed to purchase property for the Boardwalk development and then sell that property to the City for the same price it paid in its acquisition of the property. See Record Document 107, Ex. A-1. After building infrastructure for the development,

---

[2]The court notes that the correct spelling of this word is "alluvion." However, in the plaintiffs' complaint, the word is spelled "alluvian." The court uses the spelling "alluvion" throughout this memorandum ruling, except when citing plaintiffs' complaint.

such as streets, sidewalks, and parking facilities, and making necessary traffic improvements, the City would then resell the property back to Riverwalk Entertainment for further development of the property. See id. Therefore, on January 16, 2002, Riverwalk Entertainment entered into a cash sale deed with the City in which it conveyed to the City the same property it had purchased earlier that same day from Smith using the same property description used in the earlier deed. See Record Document 103, Ex. D. This deed was recorded on January 22, 2002.

Because of questions raised by the City about Smith's title to the property sold to Riverwalk Entertainment, Smith filed a possessory action in the 26th Judicial District Court in Bossier Parish, Louisiana on July 10, 2002. See Record Document 103, Ex. F. He listed twenty-two named defendants in the action, none of whom are defendants in the instant case. See id. at 1-2. The property in question in the possessory action was described as Lots 1, 2, and 3, Block 17, McCormick Annex, and Block 6, "including the bank of Red River and all rights of accretion and dereliction with respect to the tract and any alluvion or batture appertaining thereto." Id. at 3. Smith received two judgments of possession, both of which reiterated the same property description.[3] See Record Document 103, Exs. G and H.

---

[3]The record does not indicate a reason for the duplication.

During this time, Riverwalk Entertainment was negotiating with Smith to purchase the Three Lots from him as well. Smith and Good had entered into an oral agreement that Riverwalk Entertainment would be willing to purchase the Three Lots from Smith for $300,000 if Smith could provide adequate proof of ownership of the property. See Record Document 107, Ex. A at 4. However, on July 22, 2004, Robert Kyle ("Kyle"–an outside attorney), who had been retained by the City to determine whether Smith owned the Three Lots, wrote a letter to Curtis Shelton ("Shelton"), Smith's attorney, informing him that the City considered itself the owner of the Three Lots by virtue of the transfer of property to Riverwalk Entertainment and the subsequent sale of the property by Riverwalk Entertainment to the City.[4] See Record Document 107, Ex. K. Kyle stated that Smith sold Riverwalk Entertainment Lots 1, 2 and 3 of Block 17 and all of Block 6 as well as all of the alluvion, dereliction, and batture lying between those tracts of land and the Red River. See id. at 2. Kyle determined that the Three Lots, which were situated between the Block Tracts and the Red River, constituted accretion to those tracts. See id. Thus, he concluded that

_____

[4]Pursuant to a cash sale deed signed in September of 2003, the City resold the property in question to Riverwalk Entertainment, who then transferred it to Louisiana Riverwalk. Louisiana Riverwalk later sold the property to BW Land Holdings, who then sold a part of the property to Pavan Hospitality.

because the City owned those tracts of land and all accretion to them, the City, therefore, already owned the Three Lots. See id.

On March 3, 2002, four months prior to his receipt of Kyle's letter, Smith had e-mailed Shelton, his attorney, on March 3, 2004, stating that he believed that Louisiana Riverwalk and Riverwalk Entertainment did not intend to honor their prior agreements with Smith and resell him the 25,000 square feet of property in the Boardwalk for him to establish his "Violet Rose Theater." See Record Document 107, Ex. J. However, the parties continued corresponding regarding the re-sale of the property to Smith. On November 11, 2004, then counsel for Smith, James McMichael[5] ("McMichael"), wrote a letter to John Good of Riverwalk Entertainment demanding that the sale of the property back to Smith be completed by November 30, 2004. See Record Document 126, Ex. 10-X. Riverwalk Entertainment, through its attorney David Cromwell, responded, setting a time of 2:30 p.m. on November 30, 2004, for closing the property sale and providing Smith with a proposed cash sale deed for the transaction. See Record Document 107, Exs. H-3 and H-4. However,

---

[5]Curtis Shelton originally was hired as counsel by Smith. However, Shelton was a partner in the law firm that also represented the City. When the City took the stance that it already owned the Three Lots, its interests and those of Smith became adverse. Thus, Shelton withdrew from representing Smith, and McMichael became Smith's new attorney.

Smith failed to show up at the closing or sign the deed, and the sale of the property back to Smith never occurred. See Record Document 107, Ex. A at 8.

The plaintiffs, Smith and Bossier Riverside, LLC, then filed the instant suit on July 21, 2005, under 42 U.S.C. § 1983. They make fifteen separate claims against the defendants, alleging, in general, tortious conspiracy, trespass and conversion, breach of the Smith Agreement, taking of the Three Lots without compensation, violation of the Louisiana Unfair Trade Practices Act, and intentional infliction of emotional distress. Both Riverwalk and the City filed motions for summary judgment, arguing that a constitutional or state law violation has not been established and that the case should therefore be dismissed.

## II. LAW AND ANALYSIS

### A.    Summary Judgment.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (citations and quotations omitted). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co. Inc., 402 F.3d 536, 540 (5th Cir. 2005). "[T]he nonmovant cannot satisfy [his] burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 860 (5th Cir. 2004). However, when ruling on a motion for summary judgment, "doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir. 2000).

**B.    Plaintiffs' Fraud And Tortious Conspiracy Claims.**

In their amended complaint, the plaintiffs make several allegations of tortious conspiracy by the defendants. <u>See</u> Record Document 57. In their first allegation of tortious conspiracy, the plaintiffs claim the defendants conspired to fraudulently induce Smith to enter into the Purchase Agreement and transfer Lots 1, 2, 3, and 5 to Riverwalk Entertainment by promising they would sell 25,000 square feet of the property back to Smith so that he could build and operate his Violet Rose Theater (Count One). <u>See</u> Record Document 57 at 19-20. The plaintiffs argue that the defendants never intended to keep their promise regarding the re-transfer of property back to Smith. <u>See id.</u> In their second allegation of tortious conspiracy, the plaintiffs allege the defendants conspired "to deprive Smith of the ownership of the Three Lots without paying him" (Count Two). Record Document 57 at 20. The defendants respond that the plaintiffs' claims have prescribed and that the plaintiffs have failed both to establish a proper basis for a fraud claim and to prove a tortious conspiracy. The court addresses each of these arguments in turn.

10

## 1. Prescription.

Fraud is a tort claim, which has a prescriptive period of one year. See Louisiana Dep't of Educ.-Food Serv. v. Bright Beginnings Child Care, Inc., 957 So.2d 362, 366 (La. App. 2d Cir. 2007). The one-year period begins to run "from the date the injury or damage is sustained." Id. Damage is considered to have been sustained by a plaintiff "only when it has manifested itself with sufficient certainty to support accrual of a cause of action." Cole v. Celotex. Corp., 620 So.2d 1154, 1156 (La. 1993). The Louisiana Supreme Court has noted that "[i]t is often difficult to identify a precise point in time at which the claimant becomes aware of sufficient facts to begin the running of prescription. Id. at 1156-57; Cameron Parish School Bd. v. Acands, Inc., 687 So.2d 84, 89 (La. 1997). Thus, the question becomes "whether, in light of the information known, a plaintiff was *reasonable* to delay in filing suit." Cameron Parish School Bd., 687 So.2d at 88 (citations omitted). The court notes, though, that the period of prescription begins to run when a plaintiff has constructive notice of his injury, meaning he has "information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry." Boyd v. B.B.C. Brown Boveri, Inc., 656 So.2d 683, 688 (La. App. 2d Cir. 1995). Additionally,

"[p]rescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted." Id. at 686 (citations omitted).

In this case, the defendants argue that the plaintiffs' claim of fraud was not filed within the one-year period of prescription. On March 3, 2004, Smith wrote an e-mail to Shelton in which he stated,

> I have come to the conclusion that La. RW and RWE do not intend to honor any part of their previous agreements, nor to allow me to repurchase the theater site property.... It is very clear, in hind-sight, that the delays and pressure that those people have applied toward me was indicative of their true intent to prevent me from reacquiring the property and from building and operating my planned entertainment facility.

Record Document 107, Ex. J. Then, on July 22, 2004, as mentioned above, Kyle, counsel for the City, wrote a letter to Shelton informing Shelton that title to the Three Lots had already been transferred to the City and that because Smith was no longer the owner of the property, the City was ceasing all negotiations with him for purchase of the Three Lots. See Record Document 107, Ex. K. The plaintiffs then filed the

instant case on July 21, 2005, one year from the date of this correspondence, but more than one year from the March 3, 2004, e-mail.

Additionally, Riverwalk Entertainment argues that on July 20, 2004, Kyle had reported to Steve Yancey, a partner in the same firm as Shelton, Smith's attorney, that the cash sale deed transferring property to the City included the accretion and that the City, therefore, owned the Three Lots. See Record Document 151 at 10. As such, defendants claim that the plaintiffs had sufficient notice of this injury prior to the receipt of the letter from Kyle, meaning that the one-year period expired and the claim subsequently prescribed prior to July 21, 2005, the day the suit was filed.

While the court agrees that Smith's e-mail of March 3, 2004, does show Smith's concern that Riverwalk Entertainment did not intend to honor any of the previous agreements, this e-mail in no way indicates that Riverwalk Entertainment's intention had "manifested itself with sufficient certainty to support accrual of a cause of action" at that point. The e-mail is simply his opinion and does not include any specific evidence of wrongdoing or breach by the defendants; rather, it reveals Smith's frustration regarding the dealings between the parties. Additionally, during this time period, the defendants were continuing their negotiations with Smith for the

13

purchase of the Three Lots. See Record Document 126, Exs. 10-M, 10-O, 10-P, and 10-Q.

Moreover, as stated above, constructive knowledge is notice sufficient to excite attention and call for inquiry. See Campo v. Correa, 828 So.2d 502, 510-11 (La. 2002). "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." Id. at 511. In this case, the defendants offer no evidence to show that such a reasonable inquiry would have uncovered the information given to Yancey by Kyle in June of 2004. While this is likely, considering Yancey and Shelton, Smith's attorney, were law partners, it is not certain.[6] Moreover, the court notes that the time difference between the information being passed to Yancey on July 20, 2004, and the date of Kyle's letter on July 22, 2004, is approximately two days, hardly enough time to prejudice the defendants in any way. Thus, the court adheres to the spirit of the prescriptive rule and construes it against prescription, noting that Smith was reasonable in delaying filing suit until

---

[6]The court notes the intense disagreement between the parties regarding the issue of whether Yancey was considered Smith's counsel at the time Kyle relayed the information to Yancey. The court need not resolve this issue at this time, finding that Smith was reasonable in delaying filing the suit until one year after receipt of the letter from Kyle dated July 22, 2004.

after he had received the letter specifically stating the City's position that it owned the Three Lots.[7] The plaintiffs filed suit within one year from the date of this letter, which is sufficient in this court to avoid prescription.

### 2. Proper Basis For Fraud Claim.

Even though the plaintiffs' fraud claim has not prescribed, the court finds that the plaintiffs have not established a proper basis for such a claim. According to Louisiana law, "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. Civ. Code art. 1935. A cause of action exists for fraudulent misrepresentation of present and past events. See America's Favorite Chicken Co. v. Cajun Enterp., Inc., 130 F.3d 180, 186 (5th Cir. 1997). However, an action for fraud cannot be based on "unfulfilled promises or statements as to future events." Id. (citations and quotations omitted); Johnson v. Unopened Succession of Alfred Covington, Jr., 969 So.2d 733, 742 (La. App. 2d Cir. 2007) (citations omitted); Watermeier v. Mansueto, 562 So.2d 920, 923 (La. App. 5th Cir. 1990) (citations

---

[7]While this letter does not specifically pertain to the plaintiffs' claim of fraud, it is sufficient to put the plaintiffs on notice enabling them to file the entire action now before the court.

15

omitted). Thus, "[s]tatements promissory in their nature and relating to future actions do not constitute actionable fraud." Johnson, 969 So.2d at 742 (citations omitted); Bass v. Coupel, 671 So.2d 344, 351 (La. App. 1st Cir. 1995) (citations omitted). However, fraud "may be predicated on promises made with the intention *not* to perform *at the time* the promise is made." Automatic Coin Enter., Inc. v. Vend-Tronics, Inc., 433 So.2d 766, 768 (La. App. 5th Cir. 1983) (emphasis in original).

In Count One, the plaintiffs charge the defendants with fraudulently inducing Smith to enter into the Purchase Agreement and transfer his property "by making promises none of the [defendants] intended to keep with regard to the re-transfer of certain acreage and the future participation of Smith in the Louisiana Boardwalk Project with his Violet Rose Theater." Record Document 57 at 20. Because this fraud claim is based on promises made to Smith regarding the *future* re-sale of property to him within the Boardwalk development, those promises alone are not a sufficient basis for such a claim. However, the plaintiffs also argue that Riverwalk Entertainment and the other defendants did not intend to honor their promise to allow Smith to re-purchase the property at the time the Purchase Agreement was signed. See Record Document 126 at 11.

"It is well settled that one who alleges fraud has the burden of establishing it by legal and convincing evidence since fraud is never presumed, and that to establish fraud exceptionally strong proof must be adduced." Automatic Coin Enter., Inc., 433 So.2d at 767. In this case, the plaintiffs have the burden of offering "exceptionally strong proof" to support their fraud claim. In their memorandum in opposition to the defendants' motions for summary judgment, the plaintiffs state that they "contend and will prove at trial that at the time the Purchase Agreement was entered it was the intention of the Defendants not to sell the 25,000 Square Foot Tract as promised" and argue that the defendants' intentions when entering into the Purchase Agreement are a question of fact that cannot be resolved on summary judgment. Record Document 126 at 11. The plaintiffs then recount the events, without citing evidence, leading up to and surrounding the signing of the Purchase Agreement. They also make the unsupported assertion that "Good misrepresented the joint venture's plans to Smith as Good and the other joint venture participants never intended to make good on the offer to Smith to become part of the Boardwalk Project and only made the false offer to induce Smith to sell certain acreage needed for the Project." Record Document 126 at 12. Plaintiffs then refer the court to the Smith affidavit (Exhibit 1), Goeders

deposition testimony (Exhibit 3), and Shelton deposition testimony (Exhibit 4) in support of their argument.[8]

While anticipated trial testimony is **not** competent summary judgment evidence, the plaintiffs argue that the deposition testimony of Tim Goeders ("Goeders"), an original partner of Smith and Good in the Boardwalk development, indicates that Good did not intend to resell the property to Smith. When asked if, in any of the recordings Goeders had made of his business discussions with Good, there was any mention of "Mr. Good's intentions about the obligations Riverwalk [Entertainment] had to Charles Smith," Goeders responded, "Yes. John [Good] said that Charles would never get his land back." Record Document 126, Ex. 3 at 106. Goeders also testified,

> John [Good] made a comment to me that Charles [Smith] – he said, 'You and Charles were in a fantasy world thinking that I would be working with you.' Then he also made a statement that from the time that he met me all the way up through actually to the signing date where we signed our partnership, he said that he never had any intention of working with any of you, none of you, but he went ahead and got into an agreement with myself, went into an agreement with Charles [Smith], but it's clear that he never had any intention of doing a deal with us.

---

[8]See footnote 1, supra.

Id., Ex. 3 at 107. In addition, Goeders claims that Good "made one of the statements where he said Charles [Smith] would never get his land back prior to Charles signing that agreement in November of 2001." Id., Ex. 3 at 108.

On the other hand, as previously mentioned, when Smith's counsel, McMichael, demanded that the repurchase take place by November 30, 2004, a closing meeting was scheduled by Riverwalk Entertainment and a proposed cash sale deed was prepared and sent to Smith. Smith, however, failed to appear at this meeting, not the defendants, who appeared with a signed copy of the proposed deed. See Record Document 107, Exs. H-3 and H-4. Moreover, Riverwalk Entertainment continued to negotiate with Smith for re-sale of the property during the time between signing the Purchase Agreement and scheduling the closing, and the plaintiffs offer no arguments to the contrary. Such evidence indicates to the court that Riverwalk Entertainment was, in fact, willing to resell the property back to Smith as originally contracted.

Given the evidence on the record, the court finds that the statements offered by the plaintiffs do not rise to the level of "exceptionally strong proof" required to support a claim of fraud. First, none of these statements directly relates to Good's

intentions with regard to the Purchase Agreement, which is the basis of the plaintiffs' claim. Second, the court agrees with the Riverwalk Group's argument that even if these statements had been made by Good, they do not prove that Good fraudulently induced Smith to sign the Purchase Agreement. <u>See</u> Record Document 135 at 13. Third, the actions of the defendants belie any statements that Good may have made; when completion of the sale was demanded, Riverwalk Entertainment set a firm closing date and sent him a proposed cash sale deed. Most importantly, they actually showed up for the closing meeting, unlike Smith. These are not the actions of a party unwilling to complete a sale. Therefore, the court finds that the statements offered by Goeders, who himself filed suit against Riverwalk Entertainment and Good[9] and whose statements are the only evidence in the record indicating that Good did not intend to go through with the sale, do not rise to the level of "exceptionally strong proof" as required by law to establish fraudulent conduct. In addition, the City was not a party to the Purchase Agreement, and no evidence of fraudulent intent by the

---

[9]This case was settled for an undisclosed amount.

City has been proffered. Therefore, summary judgment on this claim is to be granted as to all defendants.[10]

### 3. Tortious Conspiracy.

As a basis for their fraud claim, the plaintiffs argue that a tortious conspiracy existed between the Riverwalk Group and Bossier City which led to the allegedly fraudulent inducement of Smith to enter the Purchase Agreement and to the taking of the Three Lots by Bossier City without compensation to Smith (Count One). The plaintiffs make three additional claims of tortious conspiracy. In Count Two, the plaintiffs allege a second tortious conspiracy among the defendants "to deprive Smith of the ownership of the Three Lots without paying him." Record Document 57 at 20. Similarly, in Count Seven, the plaintiffs allege a tortious conspiracy among the defendants "to deprive Smith of his ownership of the Three Lots without compensation and due process of law in violation of 42 U.S.C.A. Section 1983 and 1985." Record Document 57 at 21-22. Finally, the plaintiffs allege in Count Thirteen that the defendants' "bad faith breach of the Purchase Agreement" was the result of

---

[10]In addition, Bossier City argues that it has third-party purchaser status pursuant to the Public Records Doctrine and was not a party to the allegedly fraudulent transaction. However, because the court has determined that no fraud occurred, it is not necessary to reach this issue.

a tortious conspiracy "to prevent Plaintiffs from opening a theater and thereby competing with the Defendants' interests in the Louisiana Boardwalk Project." Record Document 57 at 23-24.

According to Louisiana law, a person "who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." La. Civ. Code art. 2324. However, Article 2324 "does not by itself impose liability." Ross v. Conoco, Inc., 828 So.2d 546, 552 (La. 2002). "The actionable element in a claim under this Article is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part." Id. (citations and quotations omitted); see also Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553, 557 (5th Cir. 1995). To recover under a theory of tortious conspiracy, "a plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury." Butz v. Lynch, 710 So.2d 1171, 1174 (La. App. 1st Cir. 1998). In this case, the plaintiffs also "must establish that there was an agreement as to the intended outcome or result." Id. Therefore, in addition to proving an unlawful act, the plaintiffs must also prove "assistance or encouragement that amounts to a conspiracy" among the

parties. Chrysler Credit, 51 F.3d at 557. As the plaintiffs correctly note, the court can infer an underlying agreement and/or conspiracy from the "quality and character" of the assistance or encouragement. Id.

Because the court did not find fraudulent inducement of Smith to enter the Purchase Agreement, which is the alleged tortious conduct in Count One, the court also finds that the defendants did not engage in a tortious conspiracy to commit fraud. The court will address the plaintiffs' additional claims of tortious conspiracy when it addresses the underlying substantive claims of each.

## C. Plaintiffs' Claims Regarding Ownership Of The Three Lots.

### 1. Whether Smith Had Marketable Title To The Three Lots.

The central issues in this case are: (1) whether Smith had marketable title to the Three Lots,[11] (2) whether he lawfully conveyed that property to Riverwalk

---

[11] In their memorandum in further opposition to defendants' motion for summary judgment, the plaintiffs' argue that when Lot 9 as described in defendant's Exhibit A-3--which includes cash sale deeds of property to Riverwalk Entertainment from parties not involved in this suit--is plotted on a map, it is in a different location than the Lot 9 at issue in this case. They, therefore, argue that there is a question whether Riverwalk Entertainment actually purchased Lot 9 from Smith. The court rejects this argument. Lots 8, 9, and 10 are contiguous lots on the bank of the Red River; until this particular filing, no party had argued otherwise. Plaintiffs also question whether the defendants possessed Lot 9 as claimed, arguing that the lot claimed by the defendants was, again, not Smith's Lot 9. Again, the court dismisses this argument.

Entertainment, (3) whether Smith was rightfully compensated for the sale, and (4) who currently owns the property.[12] Without delving into the myriad of arguments regarding ownership, active possession, adverse possession, and intent of the parties, the court notes that a host of genuine issues of material fact exist on these issues. Thus, summary judgment on the issue of ownership of the property is denied.

## 2. Alluvion, Dereliction, And Batture.

In addition, the plaintiffs claim that the Three Lots are not "alluvian, dereliction and batture" to Lots 1, 2, 3, and 5. Therefore, they argue, the Three Lots were not transferred to Riverwalk Entertainment–and, subsequently, to the City–in the cash sale deed transferring Lots 1, 2, 3, and 5 plus the accretion[13] from Smith to Riverwalk

---

Possession of a piece of property north of the lots at issue in this case is of no consequence to the court. Because summary judgment has been denied on this issue, it will fall on the parties to show at trial who rightfully possessed the Three Lots, including Lot 9.

[12]The court notes that the determination of each of these issues is contingent on the determination of whether Smith originally had marketable title to the Three Lots.

[13]The court notes that "[a]ccretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion." Walker Lands, Inc. v. East Carroll Parish Police Jury, 871 So.2d 1258, 1263 (La. App. 2d Cir. 2004). "Alluvion and accretion are terms used synonymously. Accretion is defined as the act of growing to a thing; usually applied to the gradual and imperceptible accumulation of land by natural causes, as out of the sea or river. Accretion is the

Entertainment. In Count Four, the plaintiffs seek reformation of the January 11, 2002, deed transferring Lots 1, 2, 3, and 5 to Riverwalk Entertainment and the January 16, 2002, deed subsequently transferring those lots to the City. Specifically, the plaintiffs seek to have the language "together with all alluvian, dereliction and batture lying between the above described tracts and the Red River" deleted. Record Document 57 at 21.

Reformation of a contract is an equitable remedy that can be used to correct mistakes in written instruments "only when the instruments as written do not reflect the true intent of the parties." Teche Realty & Investment Co., Inc. v. Morrow, 673 So.2d 1145, 1147 (La. App. 3d Cir. 1996). A mistake is considered mutual "if the contract has been written in terms which violate the understanding of both parties; that is, if it appears that both have done what neither intended." Id.

---

addition of portions of soil, by gradual deposition through the operation of natural causes, to that already in possession of owner." Id. at 1264 n.13 (citations omitted). According to Black's Law Dictionary, "dereliction" is "the gaining of land from the water, in consequence of the sea, river, or stream shrinking back below the usual water mark; the opposite of alluvion." "Batture," however, is synonymous with "alluvion" and is "land formed by accretion." The court uses the term "accretion" to denote the alleged alluvion, batture, and dereliction to Lots 1, 2, 3, and 5.

According to Carter Rogers ("Rogers"), who prepared the property deed, the original cash sale deed transferring the property from Smith to Riverwalk Entertainment did not include the accretion language at issue. See Record Document 103, Ex. K at 27. However, when Smith came to review the deed, he asked that the accretion language be included. In his deposition, Rogers testified, "We had originally prepared a deed with the description tracking just as the contract did,[14] and either the day of or the day prior to the closing Mr. Smith came by my office and he wanted to review the documents. He reviewed the document and he said I want that language added to the deed." Id. When asked what language that was, Rogers responded, "The alluvion dereliction batture [sic] language. He said it was in the deed when I bought it and I want it in the deed when I sell it." Id. While Smith does not specifically refute Rogers's contention that Smith himself requested the accretion language be included in the deed, Smith does claim that the deed "erroneously included 'boilerplate' language added by Bossier's title company without authorization by any party." Record Document 126, Ex. 1 at 6. Therefore, the court finds a genuine issue of material fact exists with regard to the intentions of the

_____

[14]The language in the Purchase Agreement excluded the accretion language.

respective parties at the time the contract was executed. Summary judgment on this issue is denied.

In the alternative, the plaintiffs seek a declaratory judgment in Count Five stating that the Three Lots are not alluvion, dereliction and batture to the Three Lots and that the Three Lots were not transferred to Riverwalk Entertainment in the January 11, 2002, deed. Once again, the contradictory evidence in the record demonstrates that a genuine issue of material fact exists with regard to this issue. First, the accretion language is included in the possessory action filed by Smith in an effort to quiet title to the Three Lots; Lots 8, 9, and 10 themselves are not mentioned. See Record Document 103, Ex. F at 2-3. Second, the transcript from the hearing on the possessory action again discusses the Block Tracts and "the accretion thereto." Record Document 107, Ex. W at 4. Third, the survey of the property commissioned by Smith shows the Three Lots as accretion to the Block Tracts. See Record Document 103, Ex. I. However, according to a report submitted to plaintiffs' counsel in June of 2007, long after conclusion of the possessory action, by Gary Joiner, a cartographer, the Three Lots are not accretion. See Record Document 107, Ex. X. The court notes with interest that the conflicting evidence on the record has been

27

provided by two distinct stances the plaintiffs themselves have taken on the issue. However, conflicting evidence does exist, and as such, the court finds the existence of a genuine issue of material fact. Summary judgment on this claim is also denied.

### 3. Tortious Conspiracy.

Additionally, the plaintiffs argue in Count Two that a tortious conspiracy existed among the defendants "to deprive Smith of the ownership of the Three Lots without paying him." Record Document 57 at 20. However, the plaintiffs offer no proof that such an agreement existed among any of the defendants. As previously stated, state law provides that "a plaintiff must prove that an agreement existed to commit an illegal or tortious act." Butz, 710 So.2d at 1174. The plaintiffs must also show "that there was an agreement as to the intended outcome or result." Id. No evidence exists in the record that any of the defendants conspired or agreed with any other defendant to purposefully take Smith's property from him without payment. All evidence, in fact, is to the contrary; the record is replete with negotiations between Smith and the defendants for purchase of his property, not taking of his property. Moreover, even assuming that the defendants are mistaken in their assertion that they own the Three Lots, that still would not create an agreement among them to

purposefully take Smith's property without compensating him. The evidence simply does not exist. Thus, the plaintiffs have failed to show an agreement among the parties to commit the alleged tortious act, and as such, summary judgment is to be granted as to this claim.

### 4.     Sections 1983 And 1985 Claims.

In Count Seven, the plaintiffs allege a tortious conspiracy among the defendants "to deprive Smith of his ownership of the Three Lots without compensation and due process of law in violation of 42 U.S.C.A. Sections 1983 and 1985." Record Document 57 at 21-22. The court addresses the claim under each statute separately.

#### a.     Section 1983 Claim.

For the plaintiffs to prevail on a section 1983 claim, they "must first show a violation of the Constitution or of federal law, and then show that the violation is committed by someone acting under color of state law." Brown v. Miller, 519 F.3d 231, 236 (5th Cir. 2008) (citations and quotations omitted). Additionally, a plaintiff must demonstrate that the defendants agreed to commit an illegal act. See Hey v. Irving, 161 F.3d 7 (5th Cir. 1998). A private individual may be considered to have

acted under state law in certain circumstances, including involvement in a conspiracy

with a state actor. See Ballard v. Wall, 413 F.3d 510, 518 (5th Cir. 2005). The

plaintiffs must show that the private actor "was a willful participant in joint activity

with the State or its agents." Priester v. Lowndes County, 354 F.3d 414, 420 (5th

Cir. 2004) (citations and quotations omitted). However, "mere conclusory allegations

of conspiracy cannot, absent reference to material facts, state a substantial claim of

federal conspiracy under 42 U.S.C. [section] 1983." Brinkman v. Johnston, 793 F.2d

111, 113 (5th Cir. 1986). The complaint must contain specific factual allegations

showing that a prior agreement, plan, or meeting of the minds existed between a state

actor and the defendants. See Hey, 161 F.3d 7.

The plaintiffs claim that the Riverwalk Group, acting in conjunction with the

City, a state actor, conspired to deprive Smith of ownership of the Three Lots without

compensation. See Record Document 57 at 21-22. However, plaintiffs have failed

to make more than conclusory allegations that such a conspiracy existed. The court

can find no evidence in the record that an agreement to take Smith's land without

compensating him or to commit any other unlawful act existed between the City and

any other defendant. Agreements between the parties regarding development of the

30

Boardwalk–which the plaintiffs do not even point to–are certainly to be expected and alone are not sufficient to prove conspiracy. Therefore, because the court finds, first, that plaintiffs have failed to provide evidence showing Riverwalk Entertainment, or any other defendant, acted "under color of state law" and, second, that plaintiffs have failed to demonstrate through reference to specific material facts that an agreement to commit an unlawful act existed among the parties, summary judgment is granted on this issue and the section 1983 claim is to be dismissed.

### b.     Section 1985 Claim.

To state a valid section 1985 claim, the plaintiffs "must allege that two or more persons conspired to directly, or indirectly, deprive him of the equal protections of the laws or equal privileges and immunities under the laws." Newsome v. Equal Employment Opportunity Comm'n, 301 F.3d 227, 232 (5th Cir. 2002) (citations and quotations omitted). Plaintiffs must also demonstrate that the conspiracy was based on racial or other class-based discriminatory animus. See Horaist v. Doctor's Hosp. of Opelousas, 255 F.3d 261, 270 (5th Cir. 2001); Newsome, 301 F.3d at 232; Hilliard v. Ferguson, 30 F.3d 649, 653 (5th Cir. 1994). As the record contains no evidence–and, more importantly, no allegations–of race or class-based discrimination,

plaintiffs have failed to meet their burden. Summary judgment is granted on this issue and the section 1985 claim is to be dismissed.

**D.   Plaintiffs' Claims Of Breach Of The Purchase Agreement.**

Next, the plaintiffs claim that the Riverwalk Group and the City breached the Purchase Agreement to convey 25,000 square feet of property within the Boardwalk to the plaintiffs for construction and operation of the Violet Rose Theater (Counts Eleven and Twelve). See Record Document 57 at 23. According to Louisiana law,

> an agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some obligation by either Party, is a bilateral promise of sale or contract to sell. Such an agreement gives either party the right to demand specific performance. A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.

La. Civ. Code art. 2623. A party is entitled to specific performance of a purchase agreement if the agreement contains: (1) price, (2) an adequate description of the property, (3) reciprocal consent to buy and sell, and (4) a meeting of the minds as to the thing being sold. See Rutherford v. Impson, 366 So.2d 944, 946 (La. App. 1st Cir. 1978); Wallace v. Lafourche Parish Sch. Bd., 394 So.2d 1329, 1330 (La. App. 1st Cir. 1981). "A major requirement of one who seeks specific performance is

proper performance of his part of the contract. In the absence of proper performance, plaintiffs must prove they are and were ready to comply with whatever obligations devolved upon them to perform." Thompson v. Johnson, 602 So.2d 272, 274 (La. App. 2d Cir. 1992).

While the parties agree on the law to be applied to this claim, they disagree on its application to the facts of this case. On November 30, 2001, Smith and Good, representing Riverwalk Entertainment, signed the Purchase Agreement which had been prepared by Smith's attorney, Curtis Shelton. The Purchase Agreement stated that "Riverwalk hereby agrees that Smith shall have the right to purchase from Riverwalk property available at that time not in excess of 25,000 contiguous square feet within the area of the Project Area in which entertainment businesses are located." Record Document 103, Ex. B at 4. Moreover, the Purchase Agreement specified that such property would be made available to Smith

> subject to any covenants or restrictions placed on said property by Riverwalk which are applicable to the area of the Project in which entertainment businesses are located. Riverwalk shall make available to Smith parking and other common areas and facilities for Smith's and his customers' use in connection with the aforesaid theater and facilities on the same basis and at the same cost as such are made available to other tenants or owners within the Project Area.

Id. Smith claims that despite this language, the defendants "insiste[d] on inserting unreasonable restrictions in the sale, including, without limitation, the location of the development within the Project, excessive common area maintenance charges and limited access to parking." Record Document 126 at 28. He also alleges that the defendants did not calculate the purchase price according to the terms of the Purchase Agreement. See id. The plaintiffs direct the court to the affidavit of Smith (Exhibit 1), the deposition testimony of Shelton (Exhibit 4), the deposition testimony of James Hall (Exhibit 6), and the anticipated trial testimony of these people and others as evidence supporting their position.[15]

According to Shelton, Smith's original attorney and the drafter of the Purchase Agreement, location of the theater within the Boardwalk area, design of the theater, bus parking, and common area maintenance ("CAM") fees were the issues the parties continued negotiating. See Record Document 126, Ex. 4. at 152-53, 162. Shelton specifically mentions the issue of CAM fees several times, but neither Shelton nor Smith, in their deposition and affidavit, respectively, indicate what made the defendants' alleged CAM fee proposal unreasonable. See Record Document 126,

---

[15]Again, see footnote 1, supra.

Exs. 1 and 4. Additionally, the agreement specifically included a provision for use of the common areas by Smith in "the same basis and at the same cost as such are made available to other tenants or owners within the Project Area." See Record Document 103, Ex. B at 4. The plaintiffs do not make the claim and offer no evidence indicating that the fees proposed by the defendant were different than those being assessed any other Boardwalk tenant. Rather, they simply ask questions in their opposition to defendants' motions for summary judgment, questioning whether the proposed deed comported with the Purchase Agreement. This is not competent summary judgment evidence. The plaintiffs also allude to statements allegedly made by Good indicating that Smith was never going to build his theater. See Record Document 126, Ex. 6 at 162. James Hall, an attorney for the City, explains, "But, you know, at some point in time, I mean, I think there–as time progressed, there was less and less inclination to believe it was going to come to fruition." Id. This, too, fails to indicate Riverwalk's–or any other defendants'–unwillingness or refusal to sell Smith the property. Rather, it indicates concern about the negotiations, which does not qualify as a breach of the Purchase Agreement.

In contrast to Smith's claim that the defendants were unwilling to resell the 25,000 square feet of property to him, the majority of the evidence in the record indicates Riverwalk Entertainment's willingness to continue negotiating with Smith and to consummate the sale of the property. In a letter to Smith dated April 21, 2004, Brett Thornton, Director of Development for Louisiana Riverwalk, stated,

> I am aware of you notifying my partner, Mr. John Good, Jr. as to your readiness to repurchase the site for your entertainment theater. But your request was premature as per the [Purchase] Agreement which states that you may "purchase from Riverwalk at any time after the Closing following the <u>commencement of construction of the entertainment</u> <u>business area within the Project area</u>." Since the plans for the entertainment business area had not been finalized and construction of the entertainment business area had not commenced. [sic] We were not in a position to sell you the property as requested.
>
> However, we are now in a position to sell to you the 25,000 contiguous square feet within the area of the Project Area in which entertainment businesses are located as you requested, provided you comply with the requirements as identified in Paragraph 4 of the [Purchase] Agreement with Riverwalk Entertainment, LLC.

Record Document 126, Ex. 10-O at 1 (emphasis in original). The letter concluded, "Also, we are ready and willing to resale [sic] to you the 25,000 contiguous square feet as soon as possible. You simply have to sign the agreements as described above which will guarantee us that you will comply with the requirements as identified in Paragraph 4 of the [Purchase] Agreement with Riverwalk Entertainment, LLC and we

could close within the week." Id. at 2-3. This, coupled with the fact that the defendants continued to negotiate with Smith during this period, even if not to Smith's satisfaction, indicates to the court the defendants' willingness to comply with the Purchase Agreement. Moreover, as previously stated, when Smith demanded that the property be reconveyed to him by November 30, 2004, Riverwalk Entertainment composed a proposed cash sale deed, sent it to Smith, together with the "Declaration and Establishment of Protective Covenants, Conditions and Restrictions and Grant of Easements," and scheduled a specific time for the closing. Record Document 107, Exs. H-3 and H-4. Smith then failed to show up to the closing and stopped all communications with the defendants regarding re-sale of the property. See Record Document 107, Ex. A at 8.

In addition, on June 10, 2004, Robert DeDona, General Counsel for Louisiana Riverwalk, wrote a letter to Shelton, Smith's attorney, questioning Smith's intent to complete the transaction. See Record Document 126, Ex. 10-P. Specifically, he stated, "As referenced above, your client's letter to John Good sets forth a number of terms and conditions that are contrary to the terms of the Original Agreement that was

37

prepared by you and signed on November 31, 2001. Based upon his letter, we question whether or not he truly intends on completing the transaction." Id.

Following this letter, on November 11, 2004, James McMichael, then counsel for Smith, sent a letter to Good indicating Smith's frustration at the negotiations. He explained

> Mr. Smith remains ready, willing and able to purchase the property under the terms and conditions promised to him in the [Purchase] Agreement. However, he has been prevented from doing so by your delay and refusal to live up to the Agreement. Specifically, the restrictions and so-called covenants proposed in the "Assumption and Development Agreement" and in the "Declaration and Establishment of Protective Covenants, Conditions and Restrictions and Grant of Easements[16]," referenced therein are commercially unreasonable and constitute an intentional and bad faith breach of the [Purchase] Agreement. The idea that your breach is intentional and in bad faith is supported by your own statements to, among others, Bossier City officials that you never intend to permit Charles Smith to develop his theater in the Boardwalk project.

---

[16]The "Declaration and Establishment of Protective Covenants, Conditions and Restrictions and Grant of Easements" is a declaration governing the Boardwalk issued by Louisiana Riverwalk. See Record Document 107, Ex. B at 7 and Ex. B-5. The "Assumption and Development Agreement" was a document that owners of property in the Boardwalk were required to sign which states, in part, that the assignee agrees to accept property within the Boardwalk subject to the aforementioned declaration. See Record Document 107, Ex. B at 7-8 and Ex. B-6. Neither of these documents pertained only to Smith.

Record Document 126, Ex. 10-X at 1. David Cromwell, an attorney for Louisiana

Riverwalk, having been forwarded the letter from McMichael, responded,

> Since your letter did not provide any specifics as to how your client
> believes that the recorded restrictive covenants are "commercially
> unreasonable and constitute an intention [sic] and bad faith breach of the
> [Purchase] Agreement," my client is unable to make any response to that
> contention, other than to state that it does not believe that there is
> anything commercially unreasonable about the restrictions and believe
> that they are quite suitable for a development of this nature. Mr. Good
> is also adamant that he made no statement of the nature set forth in the
> last sentence of the second paragraph of your letter (quoted above).

Id., Ex. 10-Y at 1. First, the court notes that Smith's counsel does not specifically

state what are the allegedly unreasonable restrictions and convenants, and the court

can find no evidence of those specific complaints in the record. Second, while the

parties have an obvious disagreement about the terms of the repurchase, such a

disagreement does not automatically mean that the defendants have breached the

contract. The defendants continued communicating and negotiating with Smith

regarding his concerns, as witnessed by the correspondence in the record. Third,

roughly two weeks after McMichael sent the letter to Good dated November 11,

2004, a proposed cash sale deed was drafted and sent to Smith, and a specific closing

date was set. Smith declined to show up to the closing and consummate the sale, not

39

the defendants, who appeared having already signed the deed transferring the property to Smith. See Record Document 107, Ex. A at 8. The court finds that no evidence in the record shows either an unwillingness by the defendants to resell the property to Smith or a breach of the Purchase Agreement by the defendants.

Not only has Smith failed to demonstrate that the defendants, particularly Riverwalk Entertainment, were unwilling to complete the transaction, but he also has failed to show either proper performance on his part or that he is and was " ready to comply with whatever obligations devolved upon [him] to perform." Thompson, 602 So.2d at 274. He failed to appear at the closing and failed to continue negotiating the sale with the defendants. Therefore, because the court finds no genuine issue of material fact with regard to this issue, the court concludes that the defendants did not breach the Purchase Agreement, and summary judgment is to be granted on this issue.[17]

Additionally, in Count Thirteen, the plaintiffs claim that the defendants' alleged breach of the Purchase Agreement is the result of "a tortious conspiracy to

---

[17]With regard to the plaintiffs' breach of Purchase Agreement claim, the City argues that because it was not a party to the Purchase Agreement, it cannot be held liable for any alleged breach. Because the court has found that no breach occurred, the court need not address the issue of Bossier's third-party status at this time.

prevent Plaintiffs from opening a theater and thereby competing with the Defendants' interests in the Louisiana Boardwalk." Record Document 57 at 23-24. Because the court has determined that no breach of the Purchase Agreement, which is the underlying act of the alleged tortious conspiracy, occurred, this claim, too, is to be dismissed.

**E.    Plaintiffs' Conversion And Trespass Claims.**

In Count Eight of their complaint, the plaintiffs allege that the defendants' "development of and construction on the Three Lots constitute intentional and bad faith conversion and trespass" and request a permanent injunction against the defendants to remove all structures and return the Three Lots to their original condition. Record Document 57 at 22. Additionally, the plaintiffs seek damages in Count Nine for the defendants' "development of, removal of dirt from, and construction on the Three Lots" which, they claim, constitutes bad faith conversion and trespass. Id. The court addresses the allegations of trespass and conversion in turn.

### 1. Trespass.

The tort of trespass consists of "the unlawful physical invasion of the property or possession of another." Commercial Props. Dev. Corp. v. State Teachers Ret. Sys., 808 So.2d 534, 541 (La. App. 1st Cir. 2001). "In an action for trespass, title to the land is the pivotal issue. A plaintiff who brings a trespass action bears the burden of proving his ownership." Bennett v. La. Pac. Corp., 693 So.2d 1319, 1321 (La. App. 2d Cir. 1997). As explained in Section C above, the court finds that a genuine issue of material fact exists with regard to ownership of the Three Lots. Because ownership or the right to possess is integral to a claim for trespass, the court finds that a genuine issue of material fact exists as to this claim. Therefore, summary judgment is to be denied.

### 2. Conversion.

According to Louisiana law, an action for conversion "is grounded on the unlawful interference with the ownership or possession of a movable." Sheridon v. First Fed. Sav. & Loan Ass'n, 838 So.2d 884, 888-89 (La. App. 3d Cir. 2003). Both the City and the Riverwalk Group argue that the plaintiffs cannot sustain a claim for conversion because they have not alleged interference with the possession or

ownership of a movable. The court agrees with this argument in regard to Count Eight because the removal of a movable has not specifically been alleged, and the court rejects the argument in Count Nine, which specifically alleges removal of dirt from the Three Lots. However, as previously noted, a genuine issue of material fact exists concerning ownership and/or possession of the Three Lots. Thus, a genuine issue of material fact exists with regard to ownership or possession of the movables on the property. As such, summary judgment on this claim is to be denied to the extent alleged only in Count Nine; it is to be granted with regard to Count Eight.

### 3.   **Prescription.**

Additionally, the court finds that the plaintiffs' trespass and conversion claims have not prescribed. "A plaintiff is not required to rush out at the earliest indication of a problem and file suit against all parties who might have caused him damage." Boyd, 656 So.2d at 688. Therefore, as previously explained and in accordance with state law, the court finds that Smith was reasonable in his delay in filing suit, having filed within one year of the date of the letter from Kyle stating the City's belief that it already owned the Three Lots. The plaintiffs' claims of trespass in Count Eight and trespass and conversion in Count Nine have not prescribed. The court notes, though,

that in determining that these counts survive summary judgment, the court is not inclined to grant the injunctive relief requested in Count Eight at this time.

**F.      Plaintiffs' Claims Under LUTPA.**

Additionally, the plaintiffs allege that the defendants' intentional effort to prevent Smith from opening his Violet Rose Theater (therefore, competing with the defendants' interest in the Boardwalk) constitutes an unfair trade practice in violation of the Louisiana Unfair Trade Practices Act ("LUTPA"). See Record Document 57 at 22-23, 24.   The plaintiffs argue in Count Ten that the defendants' alleged conversion and trespass on the Three Lots is the basis for the claim, and in Count Fourteen, they argue that the defendants' alleged breach of the Purchase Agreement supports such a claim.

LUTPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice." La. R.S. 51:1409A.  A trade practice is considered unfair only when it offends established public policy and is immoral, unethical, oppressive, or unscrupulous. See Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220

F.3d 396, 404 (5th Cir. 2000) (citations and quotations omitted). However, while the definition of "person" in the statute is quite broad,[18] the Fifth Circuit has limited the availability of private rights of action only to direct consumers and business competitors. See id. at 405; Gardes Directional Drilling v. U.S. Turnkey Exploration Co., 98 F.3d 860, 868 (5th Cir. 1996); Delta Truck & Tractor, Inc. v. J.I. Case Co., 975 F.2d 1192, 1205 (5th Cir. 1992). In order to qualify as a business competitor, the plaintiffs must actually or potentially engage in business that competes directly or indirectly with the defendant. See Tubos De Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc., 292 F.3d 471 (5th Cir. 2002).

The plaintiffs claim that Smith's proposed Violet Rose Theater was a potential business competitor, arguing that it "would have been in competition with the other entertainment venues operated or developed under leases by the Defendants in the Louisiana Boardwalk, including movie theaters, restaurants, bars and other business entertainment opportunities." Record Document 126 at 47. In support of this argument, the plaintiffs again merely direct the court to the affidavit of Charles Smith

---

[18]LUTPA defines "person" as "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity." La. R.S. 51:1402(8).

45

(Exhibit 1), deposition testimony of John Good (Exhibit 2), deposition testimony of

Tim Goeders (Exhibit 3), and anticipated trial testimony of Smith and Goeders and

anticipated cross-examination testimony of Good and Gary Safady.[19]  See Record

Document 126 at 48.

While it is undisputed that Smith intended to build a 25,000 square-foot

Branson-style country music theater named the Violet Rose in the Boardwalk

development, the plaintiffs do not offer any specific evidence demonstrating or

explaining how Smith's theater would have been in competition, either directly or

indirectly, with the other entertainment venues at the Boardwalk.  In his deposition

testimony, Good mentions other projects that were being considered for inclusion in

the Boardwalk development at the same time as Smith's theater.  Those included a

karaoke recording studio and a dinner theater, neither of which are the same as a

Branson-style live music venue.  See Record Document 126, Ex. 2 at 30-32.

Additionally, neither of these entities progressed beyond the investigation stage. See

id. Moreover, when asked if he had ever owned, planned, or taken steps to open a

---

[19]See footnote 1, supra.

live music entertainment venue in the Boardwalk project, Good replied, "No, other than with Charles Smith." Record Document 126, Ex. 2 at 34.

According to the Fifth Circuit,

> It is obvious that the word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors–that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be lessened or otherwise injured.

Tubos, 292 F.3d at 481. Additionally, "[t]he statute does not forbid a business to do what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious." Turner v. Purina Mills, Inc. 989 F.2d 1419, 1422 (5th Cir. 1993). The plaintiffs have listed movie theaters, restaurants, bars, and other business entertainment opportunities as potential rivals in trade without offering any evidence of how their operation would negatively impact that of a Branson-style live music venue other than ordinary commercial competition. Moreover, they have not listed a single business owned or operated by the defendants themselves that would have been in competition with Smith's theater; the mere act of developing leases in a mixed retail and entertainment development certainly does not qualify as an unfair

business practice. Plus, LUPTA in no way prevents competition among businesses, even if the plaintiffs had been able to uncover a potential business competitor. Thus, the plaintiffs' status as a business competitor, and thus their qualification for a private right of action under LUTPA, has not been established.

In addition, the plaintiffs have also failed to prove the defendants' actions in any way violated LUTPA. "To recover under LUTPA, a plaintiff must prove some element of fraud, misrepresentation, deception, or other unethical conduct." Tubos, 292 F.3d at 480. As previously explained, although the court agrees that the question of ownership of the property is in dispute, it has found no evidence of fraud in the transactions between the parties. See section II B. Moreover, LUTPA does not provide an alternative remedy for breaches of contract, meaning the plaintiffs could not recover under this statute, even had the court found a breach of the Purchase Agreement. See Infusion Resources., Inc. v. Minimed, Inc., 351 F.3d 688, 694 n.6 (5th Cir. 2003) (citations omitted) ("LUTPA does not provide an alternative remedy for simple breaches of contract"). Therefore, the court finds that no violation of LUTPA has occurred. As such, this claim is to be dismissed.[20]

_____

[20]The court notes that Bossier City argues in its motion for summary judgment that the plaintiffs' unfair trade practices claim had prescribed prior to the filing of this

## G. Plaintiffs' Claim For Intentional Infliction Of Emotional Distress.

Next, the plaintiffs argue in Count Fifteen that based on all of the allegations previously addressed by the court, they are entitled to relief for intentional infliction of emotional distress. See Record Document 57 at 24. To recover for mental anguish resulting from damage to property, the plaintiff must show (1) that the property was damaged by an intentional or illegal act; (2) that the property was damaged by acts for which the tortfeasor will be strictly liable; (3) that the property was damaged by acts constituting a continuing nuisance; and (4) that the property was damaged at a time in which the owner thereof is present or situated nearby and the owner experiences trauma as a result. See Heard v. Affordable Movers, Inc., 917 So.2d 722, 725-26 (La. App. 2d Cir. 2005) (citations omitted). "The 'mental anguish' which gives rise to a claim for damages must be real mental injury. The usual worry over the consequences of property damage (where the plaintiff suffers no direct mental injury from the negligent act) will not justify an award for mental damages." Creel v. Southern Natural Gas Co., 917 So.2d 491, 502 (La. App. 1st Cir. 2005). "Every incident of property damage is necessarily accompanied by some degree of worry and

suit. However, because the court has found that no violation of the statute occurred, it does not reach this issue.

consternation. The owner of damaged property may not recover for mental anguish unless he or she proves a psychic trauma in the nature of or similar to a physical injury, directly resulting from the property damage." Heard, 917 So.2d at 726 (citations omitted); see also Kemper v. Don Coleman, Jr. Builder, Inc., 746 So.2d 11, 21 (La. App. 2d Cir. 1999).

In their memorandum in opposition to the motions for summary judgment, the plaintiffs argue only that this allegation relates to whether they either owned or possessed the Three Lots. See Record Document 126 at 9. Thus, they claim that because ownership of the Three Lots is in dispute, this allegation survives summary judgment. The court does agree, as explained above, that ownership of the Three Lots is in dispute. However, because the plaintiffs have failed to offer a single piece of evidence of injury, even as basic as a description of symptoms suffered by Smith, the court finds that nothing on the record supports a claim for intentional infliction of emotional distress. The plaintiffs have not demonstrated that Smith suffered a "real mental injury," and, as such, summary judgment on this claim is to be granted.

## H. Plaintiffs' Claims Against John Good.

The plaintiffs also bring claims of bad faith breach of contract and tortious conspiracy against John Good in his personal capacity. Good moved for summary judgment, arguing that he acted only as an agent of Riverwalk Entertainment, a limited liability company, at all times relevant to this case. According to Louisiana law, "[a] member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company." La. R.S. 12:1320(C). Thus, as a general rule, an agent of a limited liability company is protected from personal liability when acting within the scope of his employment. See Alvis v. CIT Group Equip. Fin., Inc., 867 So.2d 102, 104 (La. App. 3d Cir. 2004). Likewise, "a mandatary who contracts in the name of the principal within the limits of his authority does not bind himself personally for the performance of the contract." La. Civ. Code art. 3016. However, an agent is not protected from personal liability when he commits the tort of fraud. See id. Specifically, Louisiana law does not derogate "any rights which any person may by law have against a member, manager, employee, or agent of a limited liability

51

company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person." La. R.S. 12:1320(D).

Good argues that he entered into the Purchase Agreement with Smith solely in the role of manager of Riverwalk Entertainment. See Record Document 107 at 43. His signature on the document clearly indicates the capacity in which he was signing. Moreover, as correctly pointed out by the defense, the Purchase Agreement does not contain any guarantee of performance by Good in his personal capacity. See id. The plaintiffs do not refute this claim. Rather, they argue only that members or managers of limited liability companies can be held personally liable for obligations of the company if they have committed fraud. See Record Document 126 at 43. While the court agrees that this is a true statement of the law, it is not applicable in this case. As explained above, no fraud has been committed in this case. Therefore, the claims against John Good in his personal capacity are to be dismissed.

## I.    Joint Venture And Single Business Enterprise.

Finally, in its motion for summary judgment, the Riverwalk Group claims that defendant O&S is not liable to the plaintiffs on any claim because it has not formed

a joint venture or partnership with any other defendant. See Record Document 107 at 36. Plaintiffs respond by alleging a joint venture among Riverwalk Entertainment, Louisiana Riverwalk, Riverwalk Manager, the City, O&S, and BW, rendering these distinct companies a single business entity "such that each is liable for the action of the other." Record Document 126 at 30.

"Since the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law." Riddle v. Simmons, 922 So.2d 1267, 1282 (La. App. 2d Cir. 2006). To qualify as a joint venture, "[t]here must be a sharing of the profits and losses with each party having some right of control over the business." Id. However, a formal agreement between the parties is not required; an oral agreement is sufficient. See id. Also, "[t]he existence of a joint venture may be inferred from the conduct of the parties and other circumstances." Id. There is no evidence in the record that O&S shared profits and/or losses with any other defendant, nor do the plaintiffs so allege. Therefore, the court finds that a joint venture was not created between O&S and any other defendant, and summary judgment on this issue is to be granted.

However, in responding to this argument by the defendants, the plaintiffs also allege that O&S and the other separate defendants form a "single business enterprise" so that they are each liable for the actions of the other. Record Document 126 at 32. The "single business enterprise theory" is "a vehicle for holding a group of affiliated entities responsible for the obligations of one of the entities." Sarpy v. ESAD, Inc., 968 So.2d 736, 738 (La. App. 4th Cir. 2007). "If one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability." Green v. Champion Ins. Co., 577 So.2d 249, 257 (La. App. 1st Cir. 1991). The court in Green then lists eighteen factors to be considered in determining if a single business enterprise does exist. See id. at 257-58. Based on the evidence in the record, the court finds that a genuine issue of material fact exists with regard to the relationship among the defendants, and summary judgment on this issue is to be denied.

### III. CONCLUSION

Based on the foregoing analysis, the City's motion for summary judgment (Record Document 103) is **GRANTED** in part and **DENIED** in part. It is granted as to Counts One, Two, Seven, Eight (conversion only), Ten, Eleven, Twelve, Thirteen,

Fourteen, and Fifteen. It is denied as to Counts Three, Four, Five, Six, Eight (trespass only), and Nine. Likewise, the Riverwalk Group's motion for summary judgment (Record Document 107) is **GRANTED** in part and **DENIED** in part. It, too, is granted as to Counts One, Two, Seven, Eight (conversion only), Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen and denied with regard to Counts Three, Four, Five, Six, Eight (trespass only), and Nine. Additionally, summary judgment is granted with regard to all claims against John Good in his personal capacity. Summary judgment with regard to whether a joint venture was created between O&S and another defendant is also granted. Summary judgment with regard to whether the defendants formed a single business enterprise is denied.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 8th day of August, 2008.

JUDGE TOM STAGG